UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR 08-00836(A) ABC |
| Plaintiff, | ORDER DENYING GOVERNMENT'S MOTION IN LIMINE 1 |
| v. | |
| ISRAEL SANCHEZ, | |
| Defendant. | |

Pending before the Court is the Government's Motion in Limine No. 1 to Introduce Additional Narcotics Transactions, filed on July 18, 2011.  Defendant Israel Sanchez ("Defendant") filed an Opposition on November 14, 2011, and the Government filed a Reply on November 21, 2011.  The Motion came on for hearing on December 5, 2011.  Upon consideration of the parties' submissions, argument of counsel and the case file, the Court **DENIES** the Motion.

**I.  BACKGROUND**

Defendant Israel Sanchez has been charged in a four-count indictment with conspiracy to distribute and distribution of

methamphetamine, in violation of 21 U.S.C. §§ 846 and 841(a)(1), respectively.[1]  The Government filed a notice of Defendant's prior felony drug trafficking conviction pursuant to 21 U.S.C. § 851, based on Defendant's prior felony conviction of possession with intent to distribute cocaine in Santa Barbara Superior Court case no. SM62665.

The indictment alleges that "[b]eginning on a date unknown, and continuing to on or about September 27, 2007, in Santa Barbara County, . . ., [Defendant], . . . and [co-defendant Daniel Benitez] together with co-conspirator Jesse Anthony Nunez, aka 'Birdy' . . . , and others . . . conspired and agreed with each other to knowingly and intentionally distribute at least fifty grams of actual methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A)(viii)."  First Superseding Indictment ("Indictment"), 1:24-28, 2:1-7.[2]  In the charged conspiracy, Defendant is identified as the supplier of methamphetamine, and the co-defendants are identified as middlemen or couriers.  The indictment alleges four specific incidents between June and July 2007 in which Defendant supplied methamphetamine to distributors who, in turn, distributed that methamphetamine to an FBI confidential informant ("CI").

In its Opening Brief, the Government describes the indictment's four methamphetamine deals in detail.  The Court will not repeat all of those details here, but each deal involved Nunez or

---

[1]  These background facts are taken from the Government's Opening Brief.

[2]  Benitez pled guilty and was sentenced to 240 months' imprisonment.  Nunez pled guilty and was sentenced to 151 months' imprisonment.

Benitez selling meth to a CI immediately after meeting with or having numerous phone calls with each other and Defendant. Some of the phone calls among Defendant, Benitez and Nunez involved references to obtaining and packaging the meth about to be sold to the CI. Some of the deals involved strange driving patterns suggestive of narcotics drop-offs or pick-ups or counter-surveillance; brief meetings at hotels; and instances of counter-surveillance performed by Defendant.

The Government now moves in limine for an order permitting it to introduce evidence of other narcotics transactions orchestrated by Defendant. The proposed evidence will be in the form of testimony from three witnesses. The Government contends that this evidence is admissible as direct evidence of the charged conspiracy because it is inextricably intertwined with the alleged offense conduct. In the alternative, the Government argues that the evidence is admissible under Fed. R. Evid. ("Rule") 404(b) to prove Defendant's motive, opportunity, intent, preparation, plan, knowledge, and absence of mistake or accident.

Defendant argues that the proffered evidence is inadmissible because it is not "inextricably intertwined" with the charged conduct. Defendant also contends that the proffered evidence is not being offered for any of the purposes permissible under Rule 404(b), but instead is impermissible propensity evidence. Finally, Defendant contends that, even if the evidence is admissible under Rule 404(b), its probative value is substantially outweighed by the danger of unfair prejudice and should therefore be excluded under Rule 403.

//

//

## II.  LEGAL STANDARDS

The Court's power to rule on motions in limine stems from "the court's inherent power to manage the course of trials." Luce v. United States, 469 U.S. 38, 41 n.4 (1984).  The Government moves for the admission of the additional narcotics transactions on two bases: that these transactions are "inextricably intertwined" and, alternatively, that they are admissible under Rule 404(b).

Evidence of "other acts" is not subject to Rule 404(b) analysis if it is "inextricably intertwined" with the charged offense.  See United States v. Vizcarra-Martinez, 66 F.3d 1006, 1012 (9th Cir. 1995).  This exception applies when (1) "particular acts of the defendant are part of . . . a single criminal transaction," or when (2) "'other act' evidence . . . is necessary in order to permit the prosecutor to offer a coherent and comprehensible story regarding the commission of the crime; it is obviously necessary in certain cases for the government to explain either the circumstances under which particular evidence was obtained or the events surrounding the commission of the crime" Id. at 1012–13.  In order to satisfy this exception, "[t]here must be a sufficient contextual or substantive connection between the proffered evidence and the alleged crime." Id. at 1013.

Alternatively, under Rule 404(b), other acts evidence is admissible if it (1) tends to prove a material point in issue; (2) is not too remote in time; (3) is proven with evidence sufficient to show that the act was committed; and (4) if admitted to prove intent, is similar to the offense charged.  See United States v. Murillo, 255 F.3d 1169, 1175 (9th Cir. 2001), cert. denied, 535 U.S. 948 (2002). The court must then assess the evidence under Fed. R. Evid. 403.  See

4

United States v. Rude, 88 F.3d 1538, 1549-50 (9th Cir. 1996).

Relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  Rule 403.  "Relevant evidence is inherently prejudicial; but it is only unfair prejudice, substantially outweighing probative value, which permits exclusion of relevant matter under Rule 403." Hankey, 203 F.3d at 1172 (citation omitted).  Rule 403's "major function is limited to excluding matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect."  Id.


### III.  DISCUSSION

**A.   None of the Proffered Evidence is "Inextricably Intertwined" with the Charged Offense.**

The Government asserts that the proffered witnesses were distributors like Nunez and Benitez, and that all were part of a "hub and spokes" conspiracy wherein they all distributed Defendant's narcotics in the same way: "they were fronted the contraband, they were aware of their roles and that others were also distributing defendants [sic] drugs, and they collected money from customers and passed that money back to defendant."  Mot. 18: 21-27.  The Court will briefly describe the Government's proffered evidence and apply the "inextricably intertwined" standard to it.

Before doing so, however, the Court will set out some overall observations about the Government's evidence and arguments because many of the same deficiencies attach to much of it.  First, although

the Government characterizes the evidence as "additional narcotics
transactions," much of the proffered evidence is not presented as
specific, discrete incidents, but rather consists of testimony about
how Defendant generally conducted his alleged narcotics deals.
Furthermore, much of the described testimony is disjointed and is
difficult to place in context, and thus does not add to the
Government's narrative.  Therefore, the connectedness between the
proffered evidence and the charges in the indictment is difficult to
discern.  Indeed, the Government does almost nothing to elaborate on
the connectedness that it claims exists.

In addition, for much of the testimony, the Government does not
indicate when the events occurred, or, if it does, the events did not
occur sufficiently near the time of the charged conduct, in June and
July 2007, to be considered "inextricably intertwined".  The
Government argues that because the indictment's allegation of when the
conspiracy began is open-ended (the indictment alleges a conspiracy
"[b]eginning on a date unknown and continuing to on or about September
27, 2007" (emphasis added)), all similar prior conduct is necessarily
captured by the indictment such that it is "inextricably intertwined"
with the charged offense and forms a single criminal transaction with
it, regardless of how remote it is.

This position is not persuasive.  To defer so thoroughly to the
open-endedness of the indictment would eviscerate the standard
identified in Vizcarra-Martinez permitting the admission of other acts
only if those other acts and the charged conduct are part of "a single
criminal transaction", or if the other acts are necessary to render
the prosecutor's story "coherent and comprehensive."  Reason dictates
that the proximity in time between the other acts and the charged

conduct is often relevant to whether those acts are inextricably intertwined, yet the Government's argument would render the time factor irrelevant.  See, e.g., United States v. Soliman, 813 F.2d 277, 279 (9th Cir. 1987) (stating, "proximity in both time and space" between the other acts and the charged conduct supports conclusion that the acts are inextricably intertwined).

Even the cases upon which the Government relies support drawing a closer connection between the other acts and the charged conduct than the Government does here.  Their facts illuminate how similar or significant the other acts must be to be considered inextricably intertwined with the charged conduct.

In United States v. Beckman, 298 F.3d 788 (9th Cir. 2002), Beckman was convicted of smuggling more than $1 million of marijuana from Mexico into the United States for Gregg.  Gregg became a cooperating witness and testified at trial that Beckman had performed five or six drug runs for him within the year prior to his arrest and that the smuggling scheme involved his couriers evading detection by posing as dune buggy driving teams.  Id. at 791.  Beckman's primary defense was that he was tricked into smuggling the marijuana, and that he believed he and Gregg were actually involved in dune buggy races.  Id. at 791-792.  The Ninth Circuit upheld the admission of Beckman's prior drug runs for Gregg as "inextricably intertwined" with the drug run for which he was charged because it allowed the prosecutor to tell a coherent and comprehensible story.  Specifically, the prior drug runs established the on-going relationship between Beckman and Gregg that culminated in the drug run for Gregg for which Beckman was charged, refuted Beckman's claimed lack of knowledge that marijuana was in the vehicle he was driving, and explained why Gregg trusted

Beckman with more than $1 million worth of marijuana (Beckman's prior runs were successful). Id. at 794. Absent this context, the Court held, the prosecutor's case again Beckman would make less sense. Here, none of the proffered other acts evidence similarly contextualizes Defendant's charged conduct.

United States v. Wright, 392 F.3d 1269 (11th Cir. 2004) involved other acts that were even more immediately intertwined with the charged conduct. There, officers had stopped Wright for speeding and weaving through traffic lanes, and, upon administering field sobriety tests, determined that he was intoxicated. Id. at 1271. The officers attempted to arrest Wright, but he resisted and a struggle ensued. Once the officers had Wright under control, they conducted an inventory search of Wright's car and found a firearm under the front seat and a cold open bottle of beer. Wright was convicted by a jury of possession of a firearm by a felon. On appeal, the Eleventh Circuit upheld the district court's admission of Wright's resistance of arrest and battery on a law enforcement officer as inextricably intertwined with the charged conduct. Citing the same standard the Government here does – that "[e]vidence, not part of the crime charged but pertaining to the chain of events explaining the context . . . is properly admitted if [it is] linked in time and circumstances with the charged crime, or [if it] forms an integral and natural part of an account of the crime . . . to complete the story of the crime for the jury" – the Court held that "the evidence of Wright's actions prior to the discovery of the firearm gives the jury the body of the story, not just the ending." Id. at 1276. Finding that Wright's resisting arrest and battery completed the prosecution's story, the Court held that the evidence was inextricably intertwined with the charged

offense.  Here, by contrast, the other acts are not parts of the
"chain of events" of the crime charged and are not otherwise part of a
coherent narrative.

Finally, in Vizcarra-Martinez, the defendant was convicted of
conspiring to possess and possessing chemicals used to manufacture
methamphetamine.  The Ninth Circuit held that the trial court erred by
admitting evidence that, when he was arrested, the defendant possessed
a small amount of methamphetamine for personal use.  The Court noted
that other acts are considered "inextricably intertwined . . . when it
is clear that particular acts are part of [] a single criminal
transaction" or when admission of the other acts is necessary "to
permit the prosecutor to offer a coherent and comprehensible story
regarding the commission of the crime."  Id. at 1012-1013.  The Court
ruled that the defendant's possession of a small amount of narcotics
for personal use satisfied neither category of inextricably
intertwined other acts for several reasons.  First, the Court stated
that there were no "contextual or substantive connections between the
proffered evidence and the alleged crime."  Id. at 1013.  The Court
also stated that "it is clear that the prosecution would encounter
little difficulty in presenting [its case] without offering into
evidence the personal-use amount of methamphetamine."  Id.  Finally,
that methamphetamine was found in defendant's pocket had nothing to do
with the incidents leading to the search or any bearing upon the
commission of the crime.  Id. at 1013.  Here, although the Government
contends that Defendant's other acts are all part of the same on-going
narcotics distribution conspiracy and thus may have some connection to
the crime he is charged with, that connection is marginal at best in
light of the passage of time between the other acts and the

conspiracy, and because it appears the Government would have "little difficulty in presenting its case without offering into evidence" Defendant's other acts.

A case that neither party cited, <u>United States v. DeGeorge</u>, 380 F.3d 1203 (9th Cir. 2004), well illustrates the distinction between the two categories of inextricably intertwined evidence and illuminates why none of the proffered evidence fits within either category. A jury convicted DeGeorge of conspiracy, mail fraud, wire fraud, and perjury based on his participation in a complex scheme to purchase a yacht, inflate its value, scuttle it, and then collect the insurance proceeds. DeGeorge had numerous prior "marine losses" (vessels lost at sea) that the Government wanted to admit into evidence. The Ninth Circuit rejected the Government's contention that those prior losses and the loss leading to the indictment were all part of a "single criminal transaction" because "the prior losses are too far removed in both time and circumstance to be linked with the alleged fraud in this case as part of a single criminal episode." <u>DeGeorge</u>, 380 F.3d at 1220. (The opinion does not say how much time passed between losses.) The Ninth Circuit did, however, uphold the district court's admission of some of this prior loss evidence as necessary for the prosecution to offer a coherent and comprehensible story. Specifically, that DeGeorge had previously lost insured vessels at sea supported the Government's allegation that DeGeorge's scheme "included sham transactions to hide his ownership of the boat and concealment of his loss history on the insurance application." <u>Id.</u> at 1220. The Court concluded that "the jury would not have understood the relevance of [DeGeorge's] transactions and concealment without hearing at least some explanation for why DeGeorge could not

obtain insurance in his own name." Id.  As such, three of Defendant's prior insured marine losses were inextricably intertwined because they explained DeGeorge's current fraud.  Notably, the district court did not admit details of the prior losses or the fact that DeGeorge collected under his previous insurance police, but strictly limited the prior loss evidence to correspond to its relevant purpose: DeGeorge's non-disclosure of prior losses.  Id.  As will be discussed below, as in DeGeorge, many of the other acts here are too remote from the charged acts to be considered the same criminal transaction, and, unlike in DeGeorge, they do nothing to explain the conduct Defendant is charged with.

With these considerations and case law guidance in mind, the Court turns to the proffered other acts.

### 1.  David "Pops" Garza's Testimony

According to the government, Garza was a drug dealer who will testify that around July 2005, he saw Defendant in possession of methamphetamine at another person's residence, where Defendant gave Garza a "shard" and asked him to evaluate its color.  Garza will testify that he saw Defendant deliver narcotics to that residence approximately five times, that he saw Defendant drop narcotics through the window of the residence, that he knows Benitez, and that he purchased narcotics from Benitez that Benitez got from Defendant.

Contrary to the Government's characterization, Garza's testimony does not describe "transactions," but rather various snap-shot instances of Defendant's behavior.  These disjointed bits of testimony do not create a picture that is "inextricably intertwined" with the charged conduct.

First, these acts and the charged conduct cannot be said to be

"clear[ly] . . . part of a single criminal transaction," <u>Vizcarra-Martinez</u> at 1012, for several reasons.  Because the conduct Garza describes is so episodic and incomplete, it simply does not add much to the rather detailed evidence of the charged conduct.  In addition, the conduct Garza describes is dissimilar from the charged conduct: Garza would testify that he saw Defendant in possession of meth and that he saw Defendant deliver narcotics to a residence about five times, while the charged conduct involved extensive details of phone calls, travel, meetings, and counter-surveillance involving Defendant and his co-conspirators, and culminating in sales to the CI.  Finally, none of the conduct Garza witnessed is in fact connected with the four meth deals alleged in the indictment, and, as such, the conduct and the four deals alleged are not "part of a single criminal transaction."  Based on the foregoing, the Court cannot conclude that the conduct Garza will testify to and the charged conduct were together "part of a single criminal transaction."

Nor does Garza's testimony make the Government's case a "coherent and comprehensible story".  Simply stated, it is not clear – and the Government does not explain – what holes in its case Garza's testimony would fill, thereby resulting in a "coherent and comprehensible story."

### 2.    Manuel "Frog" Perez's Testimony

According to the Government, Perez, like Benitez and Nunez, distributed methamphetamine for Defendant.  Perez will testify that starting in about 1997, Defendant started giving him methamphetamine for distribution.  At some point thereafter (the Government does not indicate a date), Perez was convicted and went to prison.  Then, when Perez was released in 2004, he again began to distribute

12

methamphetamine for Defendant.  Perez will testify that he has seen Defendant weigh methamphetamine on a scale for distribution to others; that he knows that Defendant fronted methamphetamine to Benitez and Nunez for them to distribute; that "paisas" named Oscar and Martin supplied methamphetamine to Defendant; that he was present at Defendant's house when paisas delivered methamphetamine to Defendant, and once or twice saw Defendant pay the paisas; that Defendant directed Perez to distribute methamphetamine when they both moved to Las Vegas; and finally, that Defendant told him that he (Defendant) was suspicious that law enforcement was onto him and he wanted to keep his methamphetamine elsewhere.

The Court cannot conclude that this evidence is "inextricably intertwined" with the charged conduct.  The general testimony relating to conduct before Perez was convicted several years before 2004 is too remote to be inextricably intertwined with the charged conduct, which occurred in 2007.  As for the conduct that occurred after Perez was released from prison in 2004, because the Government has offered no more specific time frame, the Court cannot conclude that these acts were actually part of the charged transactions, either directly or indirectly.  Furthermore, the Government has simply failed to explain why it needs this testimony to present a coherent and comprehensible story regarding the crime.  In <u>Beckman</u>, for example, the defendant's prior drug runs were for the same distributor for whom he performed the drug run that led to his arrest, the defendant used the same ruse each time, and the prior drug runs were fairly close in time to the final one.  Elaborating all of this made the Government's case more coherent, provided context to material facts, and rebutted certain aspects of the defense.  For the foregoing reasons, the same cannot be

said of Perez's testimony in this case.

### 3.   Domingo "Flacco" Rodriguez's Testimony

The Government asserts that Rodriguez was also a distributor for Defendant.  As with Perez, Rodriguez's proffered testimony concerns events from years ago, starting around 1988.  Rodriguez will testify that he had been distributing narcotics for Defendant since the 1990s. At some point, Rodriguez was incarcerated.  After Rodriguez was released from custody in 2005, Defendant talked him into distributing for him again.  Thus, in about May 2006, Defendant fronted methamphetamine to Rodriguez for him to distribute to others. Rodriguez will state that Defendant gave him the narcotics in Defendant's garage; that he sold the narcotics about one ounce at a time and paid Defendant in increments; that in May 2006 Rodriguez saw Defendant give Benitez crystal methamphetamine for distribution to others, and that Defendant also at times gave him narcotics to distribute to Nunez.  After Rodriguez was released from prison, Defendant told him that Perez distributed for him; at one point Defendant told Rodriguez that paisas would make crystal methamphetamine for him and that paisas picked up their narcotics in Mexico.  Rodriguez saw Defendant conduct counter-surveillance by approaching unfamiliar cars in the neighborhood, and knows that Defendant constantly changed his cell phone numbers.

As with Perez's testimony, Rodriguez's testimony about events from around 1988 to when he was incarcerated some years before 2005 is too remote and non-specific to be inextricably intertwined with the charged conduct, which occurred in 2007.  As for the conduct Rodriguez describes after his release, it occurred in 2006.  That conduct is not literally "part of [] a single criminal transaction" with the charged

conduct because it occurred more than a year before.  Perhaps the conduct may be part of the same overall conspiracy, but that is different from saying it is part of "a single criminal transaction," which is the standard in this Circuit.  Nor is the proffered testimony necessary for context or to otherwise make the prosecution's case coherent and comprehensible: again, the Government simply does nothing to explain what missing gaps this testimony fills.

### 4.  May 24, 2008 Phone Conversation between Defendant and Rodriguez

In this phone call, Rodrigruez asked Defendant for $5,000 to pay for an attorney to withdraw his guilty plea.  Defendant agreed to help but said he was concerned because he was hearing things about himself. Each said he had been loyal to the other.  Benitez was on speaker phone with Defendant during the call.  Defendant also said he would put money on Rodriguez's books and that "they" had "paperwork" on another individual, and that they "would get" the individuals for talking.

The Government has made no attempt to explain why this phone call should be admitted into evidence.  The Government has not demonstrated that this phone call is "inextricably intertwined" with the charged conduct consistent with the guidance set out in the case law described above, and with <u>Vizcarra-Martinez</u> in particular.  The Government has therefore not met its burden to secure admission of this evidence.

### 5.  Conclusion

For the foregoing reasons, none of the other acts that the Government seeks to admit into evidence are "inextricably intertwined" with the charged conduct.  The Government has not shown that any of the other acts are "clear[ly] . . . part of [] a single criminal

transaction", or that the other acts are necessary to provide context for its case or any of the other evidence it seeks to present.  The Court therefore **DENIES** the government's motion to admit the evidence as direct evidence of the charged conspiracy.  All of the evidence is therefore subject to Rule 404 and is inadmissible unless it satisfies one of the exceptions set out in Rule 404(b).

**B.    The Government Has Not Demonstrated that the Other Acts Evidence Satisfies the Exceptions to Rule 404(b).**

The Government contends, in the alternative, that the other acts are admissible under Rule 404(b) to show Defendant's motive, opportunity, intent, preparation, plan, knowledge, and absence of mistake or accident.  See Mot. 23:24-24:3.  (The only Rule 404(b) exception the Government does not invoke is identity.)  The Government has taken a shotgun approach to this argument, regurgitating all but one of the Rule 404(b) exceptions and asserting in a conclusory way that all of the proffered evidence is admissible based on all of those exceptions.  The Government does not specify with any particularity which of the other acts in its catalog of proposed testimony are relevant, and does not tie any of the acts to any particular 404(b) exception and explain how they fit.  This showing is simply inadequate.  By failing to tie specific evidence to specific exceptions and explaining how the exception applies, the Government has not given Defendant meaningful notice of what its arguments will be and has not given the Court any specific issues to rule upon.  It is not Defendant's burden to parse through the array of proffered evidence, anticipate what the Government's unarticulated theories are, and oppose all of them.  Nor is it the Court's job to parse through the evidence in an attempt to search for reasons to admit slivers of

it.  Finally, in addition to failing to argue with specificity how the Rule 404(b) exceptions apply, the Government has wholly failed to reckon with Rule 403.  For the foregoing reasons, the Court tentatively **DENIES** the Government's Motion to admit the proffered evidence pursuant to Rule 404(b).

### IV.   CONCLUSION

For the foregoing reasons, the Court **DENIES** the Government's Motion.

**IT IS SO ORDERED.**

**DATED:      December 5, 2011**        _____

**AUDREY B. COLLINS
CHIEF UNITED STATES DISTRICT JUDGE**